# In re G-A-C-, Applicant

*Decided July 9, 1998*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

An applicant for asylum who departed the United States after having been granted an advance authorization for parole, and who, on his return, was paroled into this country under the provisions of section 212(d)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1182(d)(5) (Supp. V 1993), was properly placed in exclusion proceedings following the Immigration and Naturalization Service's denial of his application for asylum and revocation of his parole. *Navarro-Aispura v. INS,* 53 F.3d 233 (9th Cir. 1995); and *Barney v. Rogers*, 83 F.3d 318 (9th Cir. 1996), distinguished.

Pro se

Robert F. Peck, Assistant District Counsel, for the Immigration and Naturalization Service

Before: Board En Banc: SCHMIDT, Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, JONES, and GRANT, Board Members. Dissenting Opinions: ROSENBERG, Board Member; GUENDELSBERGER, Board Member.

HOLMES, Board Member:

In a decision dated January 13, 1995, the Immigration Judge determined that the applicant was properly in exclusion proceedings and found him inadmissible under section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(7)(A)(i)(I) (1994).[1] The Immigration Judge also ruled that the applicant was ineligible for suspension of deportation under section 244(a) of the Act, 8 U.S.C. § 1254(a) (1994), in exclusion proceedings and denied his applications for asylum and withholding of

---

[1]The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), replaced the definition of "entry" with the terms "admission" and "admitted." *Compare* section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13) (1994), *with* section 101(a)(13)(A) of the Act, 8 U.S.C. § 1101(a)(13)(A) (Supp. II 1996). However, section 309(c)(1)(B) of the IIRIRA, 110 Stat. at 3009-625, allows for the applicant's proceedings to "continue to be conducted without regard to such amendments." Thus, this applicant's case is adjudicated under the pre-IIRIRA version of the Act.

deportation. The applicant has appealed. The appeal will be dismissed.

## I. FACTS

The applicant first entered the United States in 1983 as a nonimmigrant on an "F-1" student visa. He had various departures and reentries into the United States in 1988, ultimately reentering this country on August 2, 1988, on his "F-1" visa. In 1989, with the conditions in his home country of Lebanon worsening, the applicant filed an application for asylum with the Immigration and Naturalization Service. In May 1991, the applicant earned a master's degree in engineering. It is not claimed that at any point thereafter he continued as a student in this country.

In 1993, while his application for asylum was still pending, the applicant testified that he learned that his father was being treated for cancer in Paris. Shortly thereafter, he submitted an Application for Travel Document (Form I-131) to an Immigration and Naturalization Service district director, applying for an "advance parole" document so that he could visit his father. On January 28, 1993, the district director approved the applicant's request. The Authorization for Parole of an Alien Into the United States (Form I-512) advised the applicant that presentation of that document prior to March 27, 1993, would "authorize an immigration officer at a port of entry in the United States to permit the [applicant] to enter the United States *as an alien paroled pursuant to section 212(d)(5) of the Immigration and Nationality Act.*" (Emphasis added.) *See* section 212(d)(5) of the Act, 8 U.S.C. § 1182(d)(5)(Supp. V 1993); 8 C.F.R. § 212.5(e) (1993), The remarks section of the form noted:

> Subject is an alien who is not an exchange alien subject to the foreign residence requirement, is not the beneficiary of a private bill and is not under deportation proceedings, in whose case parole has been authorized by the District Director in the public interest. If, upon your return to the United States you are found to be inadmissible, you will be subject to exclusion proceedings under Section 236 of the Immigration and Nationality Act.

The arrival stamp on the Form I-512 reflects that on his return to the United States in 1993, the applicant was, in fact, indefinitely paroled into the United States under the provisions of section 212(d)(5) as a matter of "public interest."

On March 9, 1994, the Service denied the applicant's application for asylum and notified him on April 7, 1994, that his parole for deferred inspection had been revoked as of that date. *See* 8 C.F.R. § 212.5(d)(2)(i) (1994). The applicant was also served with a Notice to Applicant for Admission Detained for Hearing Before Immigration Judge (Form I-122), which advised him that he did not appear entitled to enter the United States

because he appeared to be an immigrant who, at the time of application for admission, was not in possession of a valid entry document and was not exempt from the presentation thereof.

In a prehearing brief, the applicant argued through counsel that he had been incorrectly placed in exclusion proceedings. He submitted that he had the right to have his status tested in deportation proceedings, which, in addition to allowing him to further pursue his application for asylum, would also permit him to apply for suspension of deportation. He requested that the Immigration Judge "look to the spirit of the law" because, if he had known he would not be "put in the same situation" when he returned to the United States in 1993, he never would have left to visit his sick father. However, the Immigration Judge denied the applicant's motion, concluding that he was properly in exclusion proceedings. In this regard, the Immigration Judge noted that the advance parole document issued to the applicant "clearly indicates to the holder that upon return to the United States he will be subject to exclusion proceedings under section 236 of the Immigration and Nationality Act."

The applicant pursued his application for asylum and withholding before the Immigration Judge. He testified that he was a Lebanese Christian from Bsalim, a town mostly inhabited by Christians. There had been fighting around the outskirts of this town in 1983 between Christian/Lebanese forces[2] and Syrian forces. The applicant testified that Christians in his town were forced to fight for the Lebanese forces, and that when he was in high school he had received training during breaks and at two summer camps. He was required to participate in the training or "they'll come after you and take you by force" and "they would not give you a diploma unless you participated in [this] training."

The applicant graduated from high school in 1982. Thereafter (apparently in 1983), he was drafted by the militia and forced to go to the "front" as part of a group of 40 men. He stated that he was an enlisted man, was good with artillery because of his math skills, and was second in command of his group of nine men. He was kept at the front for 1 month without leave. He was then given a 6-hour leave. He told his superiors that that was not enough time and he probably would not be able to make it back. A superior responded that if he did not return he was "a dead man." He testified that he had heard that others who had not returned from leave were hunted down or killed. He did not want to return to the front because he did not want to be part of the war. He went on leave, deserted from the militia, and hid at a relative's house. The Lebanese forces looked for him without suc-

---

[2]During most of his testimony the applicant used the terms "Christian forces" and "Lebanese forces" interchangeably. However, when addressing the conditions in Beirut, he distinguished between the "Christian militia" and the "Lebanese armed forces per se."

cess. They held his younger brother for a "couple of days" and questioned him about the applicant's whereabouts, but his brother was released because he was young and did not have a skill. In November 1983, the applicant went to the American Embassy in predominately Muslim West Beirut, without having to cross any Christian militia checkpoints, and successfully applied for a student visa. As noted above, he first entered the United States later that same year.

The applicant testified that he returned to Lebanon in 1988 to visit his parents for about 6 weeks because he was very concerned about them. He stayed at his parents' home and did not go anywhere else because of the fighting and because he did not want to be recognized by anyone, particularly his previous superiors. The applicant returned to Lebanon again in 1993 for 7 weeks because of his father's poor health. He did not have any trouble in Lebanon in 1988 or 1993. However, he testified that he was fearful of returning to Lebanon because be was afraid he would be called a deserter by former members of the Christian militia and be blamed for "losing their wars." He stated that his previous superiors still lived in his hometown, that they were armed and could not be controlled by the government, and that he was afraid they would probably do "the ultimate." He testified that the "war lords" could hunt him down anywhere in Lebanon, but acknowledged that the leader of his 40-man militia unit was not a "war lord."

## II. JURISDICTIONAL ISSUE

The initial issue raised in this case, which was briefed and argued before the Immigration Judge, is whether the applicant is properly in exclusion proceedings. There are two principal aspects to this issue. The first is whether, aside from Ninth Circuit precedent, we would agree with the Immigration Judge's conclusion that the applicant was properly in exclusion proceedings because he was paroled into the United States in 1993 under the provisions of section 212(d)(5) of the Act. The second is whether, irrespective of our own conclusion in this regard, deportation proceedings are mandated under the facts of this case by the decision of the United States Court of Appeals for the Ninth Circuit in *Navarro-Aispura v. INS*, 53 F.3d 233 (9th Cir. 1995),

### A. Law and Regulations

The applicant in this case was paroled into the United States under the authority of section 212(d)(5)(A) of the Act, which provides:

The Attorney General may, except as provided in subparagraph (B) or in section 214(f), in [her] discretion parole into the United States temporarily under such condi-

tions as [she] may prescribe for emergent only reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

The relevant, terse regulatory provision regarding this applicant's request for an advance authorization of parole is set forth at 8 C.F.R. § 212.5(e), which states:

> *Advance authorization.* When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued Form I-512.

The relevant regulatory provision regarding the termination of the applicant's parole is at 8 C.F.R. § 212.5(d)(2)(i), which, in relevant part, provides:

> *Termination of parole* — . . . .
> (2)(i) *On notice*. In cases not covered by paragraph (d)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of the district director in charge of the area in which the alien is located neither emergency nor public interest warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status which he or she had at the time of parole. Any further inspection or hearing shall be conducted under section 235 or 236 of the Act and this chapter, or any order of exclusion and deportation previously entered shall be executed.

### B. Analysis and Conclusions Regarding the Propriety of Exclusion Proceedings

### 1. Statutory Analysis

The statutory authority for an advance authorization of parole, an administrative procedure, emanates from section 212(d)(5)(A) of the Act. *See Navarro-Aispura v. INS, supra*, at 235. At the time advance parole was granted to the applicant section 212(d)(5)(A) authorized the Attorney General under certain circumstances, including emergent reasons and reasons deemed strictly in the public interest, to parole an alien into the United States under such conditions as may be prescribed. Section 212(d)(5)(A) expressly provided that such parole of an alien "*shall not be regarded as an admission of the alien* and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter *his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.*" (Emphasis added.)

87

"Advance parole" is a mechanism by which a district director can, as a humanitarian measure, advise an alien who is in this country, but who knows or fears that he will be inadmissible if he leaves and tries to return, that he can leave with assurance that he will be *paroled* back into the United States upon return, under prescribed conditions, if he cannot establish that he is admissible at that time.[3] This humanitarian administrative procedure of necessity is tied to section 212(d)(5)(A) parole authority because neither the Attorney General, nor the district director as her delegatee, has authority under law to *admit* an alien into this country unless the law authorizes such admission.[4] *See* section 212(a) of the Act. Thus, in this case, even had the district director so desired, he had no statutory authority, nor do implementing regulations create such authority, to advise the applicant that he could leave the United States and be readmitted into this country on his return if at the time of his return the applicant could not establish that he was admissible under controlling law. Absent readmission, as opposed to parole under section 212(d)(5)(A), the applicant would have no right under the Immigration and Nationality Act to have his status tested in deportation proceedings. *See Matter of Torres*, 19 I&N Dec. 371, 373 (BIA 1986), and cases cited therein.

Accordingly, when the applicant's request for an entry document was granted by the district director as a humanitarian measure, it was done so on a form which advised the applicant that, upon his return prior to a designated date, an immigration officer would be authorized to permit him to enter the United States as an alien paroled pursuant to section 212(d)(5) of the Act. He was further properly advised that if, upon return to the United

---

[3]The term "advance parole" is something of a misnomer, and this phrasing may cause some confusion. An alien in the United States can request an advance authorization of parole. If the request is approved, the alien is not at that point "paroled." Rather, the alien is advised in advance of a departure that, if he meets certain conditions, he will be paroled into the United States when he returns. This is a distinction of some significance. *See, e.g., Barney v. Rogers*, 83 F.3d 318, 321 (9th Cir. 1996).

[4]The law, of course, could provide otherwise. For example, Congress has provided that an alien granted benefits under section 301 of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5029 (relating to family unity), or an alien granted temporary protected status under section 244A of the Act, 8 U.S.C. § 1254a (1994), who is authorized by the Attorney General to travel abroad temporarily, with certain limitations, on return to the United States "shall be *inspected and admitted* in the same immigration status the alien had *at the time of departure.*" Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, § 304, 105 Stat. 1733, 1749 (emphasis added), However, it was not argued either below or on appeal that there is any such statutory authority under which the applicant before us, although inadmissible at the time of his return to the United States in 1993, could nonetheless have been admitted into the United States, and we are aware of no such authority. We note that neither dissent identifies the statutory authority that would have authorized a Service officer to have admitted the applicant into the United States at the time he returned to this country in 1993 seeking admission

States, he was found to be inadmissible, he would be subject to exclusion proceedings under section 236 of the Act, 8 U.S.C. § 1226 (1988 & Supp. V 1993). When he returned to the United States in 1993, he was, in fact, paroled into this country under the provisions of section 212(d)(5).

While one could argue whether the applicant fully understood the significance of his departure and whether clearer language could or should have been used to advise him of the consequences of his departure, those issues are not determinative of the question of statutory or regulatory authority. Advance parole is a procedure whose authority is derived from section 212(d)(5) of the Act. That section of law makes clear that the "parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall . . . have been served the alien shall . . . be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." Section 212(d)(5) of the Act. Thus, under the express language of the Act, the applicant was properly placed in exclusion proceedings once his application for asylum was denied, and his parole was properly terminated. Neither an Immigration Judge nor this Board has authority to change that result simply as a matter of equity.

## 2. Ninth Circuit Case Law

The remaining question regarding this issue, however, is whether, without regard to our conclusions set forth above, a contrary result is mandated in this case as a result of the Ninth Circuit's decision in *Navarro-Aispura v. INS, supra*. If so, we would follow that court precedent because this case arises within the jurisdiction of the Ninth Circuit. *See Matter of Anselmo*, 20 I&N Dec. 25, 30-32 (BIA 1989). We do not find an entirely clear answer to this question because the factual setting of this case falls somewhat between that in *Navarro-Aispura* and that in *Barney v. Rogers*, 83 F.3d 318 (9th Cir. 1996). We think a fair reading of these cases is that the court would have to extend somewhat its holding in *Navarro-Aispura*, and perhaps modify its later decision in *Barney*, to encompass this applicant's factual circumstance. That being the case, we do not find that our decision here is controlled by existing Ninth Circuit case law.

*Navarro-Aispura v. INS, supra*, involved an alien who had sought and been granted advance permission to return to Mexico while he had an application for registry pending before the Service. *See* section 249 of the Act, 8 U.S.C. § 1259 (1988). He traveled to Mexico and apparently was paroled into the United States on his return. The Service ultimately denied his application for registry and then commenced exclusion proceedings. The Immigration Judge concluded that the alien was properly in exclusion proceedings but granted the alien's application for registry. On appeal, the Board first rejected the alien's claim that he was entitled to deportation pro-

ceedings, then held that the Immigration Judge had no jurisdiction to consider his registry claim because the regulations only provided for administrative review of registry applications in deportation proceedings. Under this ruling by the Board, the alien lost any right for further administrative review of the registry application that was pending before the Service at the time he departed the United States.

A district court reversed this Board decision and ruled that Navarro-Aispura had the right to have his status tested in deportation proceedings. *Navarro-Aispura v. INS*, 842 F.Supp. 1225 (N.D. Cal. 1993). The Ninth Circuit ultimately agreed that, "under the circumstances of this case," the alien was entitled to a deportation hearing. *Navarro-Aispura v. INS*, 53 F.3d at 234. The circuit court further agreed with the district court that the regulations at 8 C.F.R. § 245.2(a)(4)(ii)(1993), relating to the parole of aliens with pending applications for adjustment of status under section 245 of the Act, 8 U.S.C. § 1255 (1994), applied only to aliens seeking adjustment of status, not to those seeking registry.[5] The court did not find a different result was compelled by *Landon v. Plasencia*, 459 U.S. 21 (1982). The court finally ruled that a form that Navarro-Aispura had signed acknowledging that he would be subject to exclusion proceedings, if "his application for adjustment of status was denied," did not give him adequate notice that he would be subject to exclusion proceedings upon return to the United States because, assuming he understood the form at all, he might reasonably have assumed that it did not apply to him because he was not applying for adjustment of status.

The case before us does not involve an alien who had an application for either adjustment of status or registry pending at the time of his departure from and parole back into the United States.[6] In this case, when the applicant departed the United States he had an application for asylum pending before the Service. When paroled into the United States on his return from Lebanon, he was free to pursue his application for asylum before the Service and to reapply for such relief before the Immigration Judge in these exclusion proceedings. Thus, unlike Navarro-Aispura, the applicant herein did not lose any rights with regard to the application for relief that he had pending before the Service at the time he left the United States. And, the Form I-512 that this applicant was provided did not reference adjustment of status whatsoever and specifically advised him that, if upon return to the United States he was found to be inadmissible, he would "be subject to

---

[5]We note that we also do not find the provisions of 8 C.F.R. § 245.2(a)(4)(ii) to be determinative of the issue before us in the present case.

[6]The present case also does not involve an alien with an application for suspension of deportation pending at the time of departure and return to the United States. Thus, our decision today is not dispositive of such a case.

exclusion proceedings under section 236 of the Immigration and Nationality Act."

Moreover, although the applicant herein had not been an applicant for adjustment of status at the time he left the United States, as was the case in *Barney v. Rogers*, *supra*, the court noted in *Barney* that the "at the time of parole" language in 8 C.F.R. § 212.5(d)(2), a regulatory provision cited in the district court's decision in *Navarro-Aispura*, and the provision under which the present applicant's parole was terminated, referred to the "time" of the alien's return to the United States when she was actually granted parole. This provision did not "freeze" the alien's earlier status as an illegal overstay. *Barney v. Rogers, supra*, at 321. In addition, although the alien in *Barney* asserted that the Service should have given her a "detailed explanation of exclusion, deportation, and the consequences of accepting the advance parole," the court concluded that the Service "is barred from giving the kind of legal advice to aliens that Petitioner claims she should have received." *Id.* Finally, the court noted in *Barney* that the applicant not only was able to determine that she needed advance parole if she wanted to leave the country and return, but also was able to obtain advance parole on her own, which is similarly true in the case now before us. Having previously obtained visas to enter this country, the applicant herein was aware of visa requirements and obviously was aware that he was no longer a student.

Given the facts in *Navarro-Aispura*, involving an alien with a pending application for registry who had been provided confusing information relevant to adjustment of status, and the subsequent decision of the court in *Barney v. Rogers*, we do not find that existing Ninth Circuit precedent mandates a ruling that the applicant in this case has a right to deportation proceedings. Our understanding of the law, particularly given the clarity of the language of section 212(d)(5)(A) of the Act, is that the applicant before us is properly in exclusion proceedings. We do not have authority to reach a contrary conclusion solely as a matter of equity.[7] Accordingly, we find that the Immigration Judge correctly ruled that the applicant was properly in exclusion proceedings.

---

[7]We think it fair to conclude that equitable considerations understandably have played a role in the judicial decisions relating to "advance parole." However, faced with a clear statutory or regulatory directive, our jurisdiction is limited. *See Matter of Hernandez-Puente*, 20 I&N Dec. 335 (BIA 1991), We additionally note that, although couched in different language, the actual underpinnings of the dissents are equitable considerations rather than an identification of the statutory authority under which this applicant could have been admitted to the United States by a Service officer in 1993 in the face of sections 212(a) and 212(c)(5) of the Act.

## III. REMAINING ISSUES

The Immigration Judge concluded that the applicant had not established that he had either been a victim of past persecution or that he presently had a well-founded fear, or faced a clear probability, of persecution in Lebanon on account of his race, religion, nationality, membership in a particular social group, or political opinion. *See* sections 101(a)(42)(A), 208(a), 243(h) of the Act, 8 U.S.C. §§ 1101(a)(42)(A), 1158(a), 1253(h) (1994); *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); *INS v. Stevic*, 467 U.S. 407, 418, 421 (1984); *see also INS v. Elias-Zacarias*, 502 U.S. 478 (1992). Accordingly, the Immigration Judge denied the applicant's applications for asylum and withholding of deportation. On appeal, the applicant simply states that the Immigration Judge erred in "denying my asylum claim."

We find no error in the Immigration Judge's decision denying the applicant's request for asylum. The applicant was clearly not a victim of past persecution, having once been threatened with harm if he deserted the militia.[8] Moreover, the warning he received against desertion from a superior in the militia, when he was going on leave from his 40-man unit, occurred some 15 years ago. He has returned to his hometown in Lebanon without incident on two occasions, for 6 weeks in 1988 and 7 weeks in 1993, when fighting was still ongoing. The applicant has not challenged the Immigration Judge's summary of the changed and improved circumstances in Lebanon in recent years. And, he has not presented evidence that would support the reasonableness of his stated fear of harm from his former superiors because of his desertion from the Christian militia in 1983.[9] On this record, we do not find that the Immigration Judge erred in denying the applicant's request for asylum.

The applicant submits that the Immigration Judge erred in denying his application for suspension of deportation; however, he has not demonstrated his eligibility for such relief in exclusion proceedings. *See Yuen Sang Low v. Attorney General*, 479 F.2d 820 (9th Cir.), *cert. denied*, 414 U.S. 1039 (1973); *Matter of Torres, supra*. Finally, the applicant submits, in a conclusory manner, that the Immigration Judge erred in denying his

---

[8]The applicant's testimony regarding his past history in Lebanon and the circumstances under which he left that country in 1983 differ from the information reflected in the October 7, 1989, affidavit that he submitted with his initial application for asylum (e.g., he stated in 1989 that he had served with the militia for 1 year and he did not claim to have been threatened by his superiors or to have deserted from his unit). However, the credibility of his testimony was not questioned below, and we accept, as true, his testimony before the Immigration Judge.

[9]As noted by the Immigration Judge, the applicant only expressed a fear of harm by those with whom he briefly served in the militia in 1983.

"motion to continue proceedings." However, we find no error in the Immigration Judge's denial of a prehearing motion to continue proceedings pending Service action on a petition filed by the applicant's employer to classify him as a "specialty worker." In any event, the applicant has not identified any prejudice in this regard. *See Matter of Sibrun*, 18 I&N Dec. 354 (BIA 1983). Accordingly, the applicant's appeal will be dismissed.

**ORDER:** The appeal is dismissed.

Vice Chairman Mary Maguire Dunne and Board Member Lori L. Scialabba did not participate in the decision in this case.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully dissent.

I believe it of the utmost importance for us to understand the facts and time line involved, as well as to determine the controlling law, in this case. Considering the facts, and in particular, considering them in light of the applicable statutory and regulatory provisions and the law of the United States Court of Appeals for the Ninth Circuit, in which this case arises, I believe that the "applicant" belongs in deportation proceedings, where he properly would be referred to as the "respondent."[1] At a minimum, without regard to what we call him or the proceedings in which his eligibility to remain in the United States or attain asylum or some other lawful status is considered, I believe that he is entitled to pursue his application for suspension of deportation, which was summarily rejected by both the Immigration Judge and this Board.

In my view, the majority has focused incorrectly on the Ninth Circuit decision in *Barney v. Rogers*, 83 F.3d 318 (9th Cir. 1996) (involving a claim of the right to deportation proceedings after a departure and return to pursue an adjustment of status application), as resolving the issue before us, viewing that decision as creating an ambiguity in circuit precedent, and alleviating our obligation to follow the Ninth Circuit's decision in *Navarro-Aispura v. INS*, 53 F.3d 233 (9th Cir. 1995) (involving the right to a status determination in deportation proceedings following a departure and return in order to consider a registry application). Insofar as these decisions address the adequacy of notice the applicant received at the time he was

---

[1] I would refer to the "applicant" by name both as a matter of dignity and as an indication that I do not believe him to be considered to be seeking entry or admission to the United States, were it not for the fact that our commitment to protecting the confidentiality of asylum applicants overrides these other concerns. My reference to him as the "applicant" should not, however, be taken to mean that I believe it appropriate to treat him as an applicant for admission.

granted advance parole, I agree with my dissenting colleague, Board Member John Guendelsberger, that *Navarro-Aispura v. INS*, *supra*, appears to govern. Neither decision, however, really gets to the heart of the matter before us.

In reality, it is *Mendoza v. INS*, 16 F.3d 335 (9th Cir. 1994), which gives significant weight to the "brief, casual and innocent" statutory language enacted by Congress in section 244(b) of the Immigration and Nationality Act, 8 U.S.C. § 1254(b) (1994) — and the sense of the court in *Rosenberg v. Fleuti*, 374 U.S. 449 (1963), where that language originated — that actually authorizes the applicant's departure and return as a "deportable alien." *See also Aguilera-Medina v. INS*, 137 F.3d 1401 (9th Cir. 1998); *Espinoza-Gutierrez v. Smith*, 94 F.3d 1270 (9th Cir. 1996), Furthermore, as the decisions of the Ninth Circuit have held uniformly in cases similar to this one, the fact that "advance parole" was used as the mechanism for the applicant's departure and return does not mandate any particular treatment of the applicant on his return that would compromise his access to statutorily available benefits that would be available to him but for his having traveled briefly for emergent reasons. *See Patel v. Landon*, 739 F.2d 1455 (9th Cir. 1984) (relying on *Landon v. Plasencia*, 459 U.S. 21 (1982), and *Joshi v. District Director, INS,* 720 F.2d 799 (4th Cir. 1983)); *see also Castrejon-Garcia v. INS*, 60 F.3d 1359 (9th Cir. 1995), These are the decisions that ultimately should govern the outcome of the issue before us.

## I. RELEVANT INDIVIDUAL AND PROCEDURAL FACTORS AFFECTING THE APPLICANT'S PRESENT LEGAL POSITION

The applicant entered the United States lawfully 15 years ago, in 1983, as a foreign student, coming from a Christian Lebanese community of Bsalim, near Beirut, Lebanon. He complied with his nonimmigrant status and obtained his master's degree in mechanical engineering in 1991. During the 15 years he has been physically present in this country continuously, he has had two absences, the first of approximately 6 weeks, and the second of 7 weeks, totaling approximately 3 months.

### A. The Applicant's Immigration History

On June 18, 1988, while still in student status, the applicant returned briefly to Lebanon — traveling by boat from Cyprus, since the Beirut airport was shut down — to ascertain the well-being of his family after their town had been shelled and bombarded during the civil war. In 1989, shortly after his return from this brief visit to Lebanon and while he was still in lawful student status, he applied for asylum based on his fear of persecution

in Lebanon, and awaited adjudication of his asylum request by the Immigration and Naturalization Service.

A document in the record indicates that, nearly *4 years* later, in January 1993, while his asylum application was still pending and unadjudicated by the Service, he learned that his father "has cancer and is being treated in Paris" and that his mother, who was there in Paris with his father, wanted the applicant to see him. This Application for Travel Document (Form I-131) was signed by the applicant on January 4, 1993, was stamped "approved" on January 8, 1993, and was hand delivered to him on January 28, 1993. The applicant returned in March 1993 and was inspected by the Service and, according to that inspection, he was then "deferred" into the country without any further determination being made on his status. In a prehearing brief, the applicant's counsel reported that the Service's "INS Nonimmigrant Information System" reads: "*Date Admitted*: 3,20,1993" (emphasis added), indicating the applicant returned within 2 months of his departure.[2]

A year after the applicant's brief departure and return in 1993, and almost 5 years after he first filed his asylum application, the Service adjudicated his asylum application and denied it. According to the applicant's prehearing brief, the referral erroneously indicated that the applicant was paroled into the United States and then "subsequently applied for asylum." By letter dated April 7, 1994, the applicant was advised that the "Parole for Deferred Inspection when you made your application for admission" was revoked, and Forms I-122 and I-110, alleging and informing the applicant and the Immigration Court that the applicant appeared to be an intending immigrant not in possession of the proper documents, were filed by the Service.

At the time the applicant departed the United States with permission in 1993, he had been in this country following a lawful admission for nearly 10 years. I note that as an asylum applicant with a pending asylum application before the Service, the applicant was entitled to remain in the United States. He was granted "employment authorization" by the Service in October 1989, following the filing of his asylum application.[3] I also note that the applicant did not seek permission to travel briefly to the country in which he feared persecution, but to a third country, France,

---

[2]This document also indicates that the applicant certainly was inspected and his return recorded, and it raises a question whether he was "admitted," as the document actually states.

[3]The applicant's authorization is based on an asylum application filed in 1989 and preceded 8 C.F.R. § 208.7 (1997) and former 8 C.F.R. §§ 208.7 and 274a.12(c)(8) (1990), The record, which contains evidentiary documents provided up to and including the hearing before the Immigration Judge, which concluded on January 13, 1995, includes duly filed tax returns for the years 1990 through 1992 and a W-2 statement for the year 1994.

where his father was being treated.[4]

## B. The Notice Received by the Applicant

The travel authorization provided to the applicant when he applied to travel for emergency purposes stated, "[S]ubject is an alien . . . in whose case parole has been granted in the public interest . . . . *[I]f, on your return . . . you are found to be inadmissible, you will be subject to exclusion proceedings . . . ."* (Emphasis added.)  This travel authorization, received in response to a single travel application filed by the applicant during the 5 years that the applicant awaited the Service's adjudication of his asylum application, did not advise him that should the Service deny asylum, he would be considered inadmissible since his student status had expired and he was "out of status."

The applicant was not put on notice that he would forfeit the opportunity for any further consideration of his asylum application or any other claim to eligibility to remain in the United States to be determined in deportation proceedings. Specifically, it did not advise him that he would be unable to seek suspension of deportation for which he already had accrued more than the statutory requirement of 7 years' continuous physical presence, contrary to the statutory provision indicating that "brief, casual, and innocent" departures did not interrupt the continuous period of physical presence required of suspension of deportation applicants "immediately preceding" their applications. *See* section 244(b)(2) of the Act, 8 U.S.C. § 1254(b)(2) (1994), In addition, the travel authorization suggested that he could "return" and did not advise him that "inadmissibility" would be incurred by his merely returning to the United States as authorized, in the status he had when he departed.

It also did not advise him that, should he be "subject to exclusion proceedings,"  he would forego the benefit of provisions requiring a specific period of time from receipt of notice of the charges to the time of his hearing and the opportunity to obtain counsel to represent him that he would have received in deportation proceedings.[5]  It did not inform him that, under

---

[4]Regulations adopted in December 1994, long after the asylum application in this case had been filed and almost 2 years after permission for temporary travel was sought while that application was pending, provided that an asylum application will be deemed abandoned if the applicant travels to the country of claimed persecution, unless compelling reasons for such travel are shown. 8 C.F.R. § 208.8 (1997).

[5]The procedural protections and substantive forms of relief that are available in deportation proceedings are considerably different and more extensive than those available in exclusion proceedings. *See Landon v. Plasencia, supra.* Congress has made some effort to eliminate these distinctions in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), *Cf.* section 240 of the Act, 8 U.S.C. § 1229a (Supp. II 1996).

such circumstances, he would not be eligible to apply for voluntary departure, as he would have been in deportation proceedings. He was not informed that, under the law then in effect, he would not have access to a bond redetermination hearing before an Immigration Judge, or that the Service would no longer bear the burden of proving he was deportable, or that he no longer would be eligible for an automatic stay of deportation pending an appeal to the federal circuit court of appeals.

## II. STATUTORY PROVISIONS AND CASE LAW ENTITLING THE APPLICANT TO A HEARING IN WHICH HE CAN SEEK SUSPENSION OF DEPORTATION

### A. The Statute Requires Our Finding That the Applicant Did Not Make a Meaningful Departure

The applicant's case is controlled by the former provisions of the Act pertaining to deportation and relief from deportation in the form of suspension of deportation. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, § 301(c), 110 Stat. 3009-546, 3009-575 ("IIRIRA"). These provisions are found at former sections 242 and 244 of the Act, 8 U.S.C. §§ 1252 and 1254 (1994).[6]

Former section 244(b)(2) of the Act provides, in pertinent part, that "[a]n alien shall not be considered to have failed to maintain continuous physical presence . . . if the absence . . . was *brief, casual, and innocent and did not meaningfully interrupt the continuous physical presence*." (Emphasis added.) This language originated in the Supreme Court case of *Rosenberg v. Fleuti, supra*. In *Espinoza-Gutierrez v. Smith, supra*, the court found that "[h]istorically, this language has been viewed as a border-crossing mechanism." *Id.* at 1275. The Ninth Circuit went on to conclude that "[w]hen Congress adopts language from case law into statutes, there is a strong presumption that Congress intended the language to have the same purpose in the statute, as it did in the common law." *Id.; see also Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

---

[6]Assuming that the applicant's eligibility for suspension of deportation under former section 244(a) is governed by current sections 240A(d)(1) and (2) of the Act, 8 U.S.C. §§ 1229b(d)(1) and (2) (Supp. II 1996), under the transition rule contained in section 309(c)(5) of the IIRIRA, 110 Stat. at 3009-627 — a matter that has not been addressed by the Board in light of the recent amendment of that section of the new law by the Nicaraguan Adjustment and Central American Relief Act, Title II of Pub. L. No. 105-100, 111 Stat. 2193 (1997) — the applicant would qualify for suspension of deportation as he had acquired 7 years of continuous physical presence prior to his departure and has not been absent from the United States for an aggregate of time greater than that allowed by the statute. I note, in addition, that to date, he has not been served with an Order To Show Cause and Notice of Hearing (Form I-221) or a Notice to Appear (Form I-862).

The applicant resided in the United States since 1983, a period of 15 years to the present time, and a period of 10 years to the time that he departed in 1993 to visit his ailing father. At the time that the applicant departed in response to a family emergency, section 244(b)(2) of the statute provided that the applicant's continuous physical presence would not be considered to have been broken by virtue of such a departure, as it was not meaningfully interruptive of the period of time he had resided in the United States and might continue to reside here. In other words, Congress contemplated that an "illegal alien" who would otherwise be eligible to apply for and be granted suspension of deportation would not be rendered ineligible by virtue of making such a departure. The applicant did attempt to apply for suspension in the proceedings from which this appeal is taken, but consideration of his application was foreclosed, in my opinion, erroneously.

*Barney v. Rogers, supra*, relied on by the majority, involved an applicant who obtained permission in the form of "advance parole" to travel and return to the United States while his application for adjustment of status was pending. As the dissent of Board Member John Guendelsberger indicates in detail, the "advance parole" document in that case specifically advised the applicant of the consequences of departure related to that application. Equally or even more important to our consideration of this case, *Barney* did not involve any relevant statutory provision that specifically contemplated that a departure would not meaningfully interrupt or disturb the applicant's prior status for purposes of eligibility for discretionary relief. The application of *Barney* to the instant case virtually nullifies the operation of former section 244(b)(2) of the Act, which expressly contemplates that a suspension application will be made by an alien on his return from travel abroad.

### B. Supreme Court Law Requires Our Finding That the Applicant's Departure Was Not Meaningful or Interruptive of His Eligibility for Suspension of Deportation

In addition to the statutory basis for treating the applicant as having made only a brief, casual, and innocent departure, case law supports our treating the applicant as not having meaningfully interrupted his presence in the United States by virtue of his departure and determining his status in a deportation proceeding. The applicant's last absence was for 2 months, making it brief. It was not undertaken for any unlawful purpose, making it innocent. And, as discussed below, although the applicant sought travel authorization in order to comply with the immigration laws while responding to his family emergency, he did not consider his trip interruptive of his residence or intend to depart in a manner that would meaningfully interrupt his residence, making his departure casual.

In *Rosenberg v. Fleuti, supra*, the Supreme Court addressed the return of a lawful resident alien who, had he been found to be making an entry to the United States, would have been subject to exclusion proceedings and found excludable, holding that his departure would not be a "meaningful" one, resulting in an "entry," if it was not the applicant's intent to depart in a manner meaningfully interruptive of his permanent residence. *Id.* at 462. The Court emphasized that the amendment of the statute, with respect to lawful resident aliens, focused on the permanent resident's intent as reflected by the length of the absence, the purpose of the absence, and evidence that the resident considered the implications of his leaving the country. *Id.* Particularly applicable to the case before us is the Supreme Court's admonition that the "brief, casual, and innocent" distinction protects qualifying residents from "unsuspected risks and unintended consequences of . . . a wholly innocent action." *Id.; see also Landon v. Plasencia, supra.*[7]

The applicant before us is not a permanent resident, but these indicia of intent with respect to his travel, and the standards developed in *Fleuti* and *Landon* apply equally to him for purposes of characterizing his departure. Based on the statutory exception that we must observe in determining his continuous physical presence for purposes of assessing his eligibility for suspension of deportation, we must consider whether his departure was brief, casual, and innocent. As I have indicated above and conclude below, his departure comes within this exception, and he should be protected from the unintended consequences of his having traveled as he did.

## C. Ninth Circuit Law Requires That the Applicant Have the Opportunity To Apply for Suspension of Deportation in a Deportation Hearing

In *Mendoza v. INS, supra*, the Ninth Circuit acknowledged that the *Fleuti* doctrine had been specifically expanded by Congress to encompass "illegal aliens" seeking suspension of deportation. *Id.* at 337 (referring to section 244(b)(2) of the Act). The court distinguished the circumstances of an alien seeking suspension of deportation or legalization, for whom express statutory exceptions existed, from those of the petitioner, who attempted to invoke the doctrine to terminate deportation proceedings based on her having used a smuggler to return to the United States after a 3-day

---

[7]In *Landon v. Plasencia, supra,* the Supreme Court acknowledged the particular treatment to be afforded a lawful permanent resident, and recognized that a permanent resident was to be entitled to the incidents of due process normally available only in a deportation proceeding. *Id.* at 328 (citing *Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953)), The Supreme Court clarified that the constitutional considerations underlying *Chew* did not so much mandate a particular forum for determining the resident's status as they required that the incidents of due process normally afforded a resident were to be observed.

departure. The court stated that "an illegal alien who departs for a very brief time and later seeks suspension of deportation or legalization is deemed not to have entered." *Id.* at 338.

The character of the applicant's departure is not only central to whether he can qualify for suspension of deportation, but to our determination whether he belongs in exclusion or deportation proceedings. If, according to the express statutory provision enacted by Congress in section 244(b)(2), his departure was not a meaningful one, we must afford him an opportunity to apply for suspension of deportation as he has attempted to do. Unless we are prepared to offer him an opportunity to seek suspension of deportation in an exclusion proceeding under the rationale of *Landon v. Plasencia, supra*, his status must be determined in deportation proceedings, the only context in which he can apply for suspension for deportation.

Case law in the Ninth Circuit does not distinguish brief, casual, and innocent departures accomplished with advance parole from those undertaken without authorization. In *Patel v. Landon, supra*, the Ninth Circuit expressly found that "it is clear" that the departure of an alien who had been granted advance parole and was inspected on his return was brief, casual, and innocent. *Id.* at 1457. The court found the character of the travel — a 1-month trip by the appellant to visit his ailing father in India — came within the *Fleuti* doctrine's definition.

Although Patel was an applicant for adjustment and could have pursued his application before the district director, or even applied for his immigrant visa at a consular post abroad had that failed, the court found that "[i]t is clear that deportation hearings afford substantial procedural advantages not present in exclusion proceedings." *Patel v. Landon, supra*, at 1457; *see also Navarro-Aispura v. INS, supra*, at 235. By contrast, the applicant in this case sought to apply for suspension of deportation, a form of relief not available directly from the district director, and not available — at least as the law has been construed to date — in exclusion proceedings, but only available in deportation proceedings.

In *Patel v. Landon, supra*, the Ninth Circuit rejected outright the Service's contention that merely "by the attendant grant of advance parole," Patel lost his right to have his status determined in deportation proceedings. *Id.* at 1457.[8] Nothing in the statute or regulations expressly makes obtaining advance parole a factor that precludes a finding that the applicant's departure was brief, casual, and innocent. In particular, in *Sharma v. Reno,* 902 F.Supp. 1130 (N.D. Cal. 1995), the court recognized that brief, casual,

---

[8]The regulation in question contained two alternative clauses — one in which an individual was granted advance parole and inspected on his return, and another in which an individual's departure was unintended or innocent and casual, his absence was brief, and he was inspected on his return. *See* 8 C.F.R. § 245.2(a)(3) (1984).

and innocent travel accomplished by means of advance parole as a form of travel authorization did not require an otherwise qualified and eligible alien to forfeit the determination of his or her status in a deportation proceeding. *Id.* at 1137 n.8 (stating that "8 C.F.R. § 212.5(f) allows the INS to grant 'advance parole' to an alien before he attempts to enter the United States, 'INS also utilizes advance parole to permit aliens to leave the country and to reenter lawfully without jeopardizing pending applications for discretionary relief.' *Navarro-Aispura v. INS*, 53 F.3d 233, 235 (9th Cir. 1995)."); *see also Joshi v. District Director, INS, supra*, at 803 (finding that advance parole is simply an administrative device).

In addition, the Ninth Circuit has specifically rejected the Board's interpretation of the "casual" element of the *Fleuti* doctrine as limiting casual departures to those made without travel documents. *See Castrejon-Garcia v. INS, supra*. The Ninth Circuit observed, with disapproval, that "[a]pparently the Board understood 'casual' to be the same as 'unstudied' or 'informal,'" one of twelve distinct meanings for the term contained in Webster's Third New International Dictionary, and concluded that the Board's definition was "plainly contrary" to the sense intended by Congress, "penaliz[ing] a good faith effort to comply with the immigration laws of our nation." *Id.* at 1362.

In that case, addressing an "illegal alien" who was, like the applicant, the potential beneficiary of section 244(b)(2) of the Act, the Ninth Circuit found that "[t]he evident statutory purpose is to recognize that *a person who lives for seven continuous years in the United States does not destroy his eligibility [for suspension] by actions that do not affect his commitment to living in this country.*"  *Castrejon-Garcia v. INS, supra*, at 1362 (citing *Kamheangpatiyooth v. INS*, 597 F.2d 1253, 1256-57 (9th Cir. 1979)) (emphasis added). The court held that when the purpose of a single absence was to obtain a visa that would regularize his status, an alien has not meaningfully interrupted his physical presence. *Id.* at 1362-63.

The applicant in this case has had a single absence for a family emergency. To treat his departure as being a meaningful one that cannot qualify as "casual" because he obtained advance parole, rather than attempting to depart and return surreptitiously, would be to "penaliz[e] a good faith effort" to comply with the immigration laws. The fact the applicant obtained travel authorization does not reflect that he intended to break his ties with this country or alter his commitment to living here permanently. According to Ninth Circuit law, his absence on this single occasion was "casual" in the sense of Webster's definition 2(a), "performed without regularity" or "occasional."  *Castrejon-Garcia v. INS, supra*, at 1363.

## III. CONCLUSION

Both the statute enacted by Congress and relevant case law favor restor-

ing the applicant to the position he was in before he traveled. Had he never traveled in response to a family emergency in 1993, denial of his asylum application would have been followed by issuance of an Order to Show Cause. His status then would have been determined in a deportation proceeding where he could apply and be considered for suspension of deportation under section 244 of the Act. Giving effect to the "brief, casual, and innocent" distinction incorporated into the statute would protect the applicant from the "unsuspected risks and unintended consequences" of his visit to his ailing father, which was "a wholly innocent action" undertaken on a single occasion. *Rosenberg v. Fleuti, supra*. The majority ignores and fails to offer a reasonable explanation for failing to follow the statute and the case law consistent with it. Consequently, I dissent.[9]

*DISSENTING OPINION:* John W. Guendelsberger, Board Member

I respectfully dissent.

I dissent because I believe that the outcome of this case is controlled by the holding and rationale of the United States Court of Appeals for the Ninth Circuit in *Navarro-Aispura v. INS*, 53 F.3d 233 (9th Cir. 1995), As in *Navarro-Aispura*, the notice afforded to the applicant in this case at the time of his request for advance parole did not adequately inform him that he would lose his right to a deportation hearing upon inspection and admission to the United States pursuant to a grant of advance parole.

*Navarro-Aispura* involved a long-term resident of the United States who, during the pendency of his application for registry, departed and returned to the United States pursuant to a grant of advance parole. About 1 year after his return, the Immigration and Naturalization Service denied Navarro-Aispura's application for registry and commenced exclusion proceedings. Since administrative review of a Service denial of registry is available only in deportation proceedings, the issue presented in *Navarro-*

---

[9]By issuing this decision, the majority has, in essence, rejected the legal points posited by my separate dissenting opinion (and that of Board Member Guendelsberger), as well as those made by the applicant. Consequently, I believe the applicant may be said to have exhausted his administrative remedies. *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (holding that exhaustion of administrative remedies is required because "orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction"); *see also Castillo-Villagra v. INS*, 972 F.2d 1017, 1024 (9th Cir. 1992) (stating that "exhaustion of administrative remedies by a motion to reopen may be required as a matter of prudence in order to develop a proper record, prevent deliberate bypass of the administrative scheme, and allow the agency to correct its own mistakes") (citing *Montes v. Thornburgh*, 919 F.2d 531, 537 (9th Cir. 1990).

*Aispura* was whether the right to a deportation hearing was forfeited by the acceptance of a grant of advance parole.

The court in *Navarro-Aispura* first recognized "that deportation proceedings afford greater procedural and substantive rights to an alien than do exclusion proceedings." *Id.* at 235. The right to renew an application for registry is one of the substantive rights afforded in a deportation hearing, but unavailable in an exclusion hearing. At the time he sought advance parole, Navarro-Aispura had acquired the requisite number of years of residence to qualify for registry and had applied to the Service for such relief from deportation. On his advance parole form Navarro-Aispura was notified that

> [if] your application for Adjustment of Status is denied, you will be subject to exclusion proceedings under section 236 of the Immigration and Nationality Act. Individual is to be paroled into the United States for an indefinite period of time providing prima facie eligibility for adjustment of status continues.

*Id.* at 236. The court in *Navarro-Aispura v. INS* found this notice afforded insufficient warning to justify the loss of the right to renew the registry application in deportation proceedings. The court reasoned that "[a]ssuming petitioner understood the form at all, he might reasonably have assumed that the warning did not apply to him, since he was not applying for adjustment of status." *Id.*

The applicant in the instant case seeks the opportunity to apply for suspension of deportation, a form of relief which, like registry, depends upon his having demonstrated a long period of residence in the United States and proof of good moral character during that period. Like registry, suspension of deportation is available in deportation proceedings, but not in exclusion proceedings. *See* section 244(a) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a) (1994); 8 C.F.R. § 244.1 (1997),

The importance of the potential relief at stake and inadequate notice that such relief could be forfeited by departing pursuant to advance parole are crucial factors in this case, as they were in *Navarro-Aispura*. At the time he sought advance parole, the applicant had accrued the 7 years of "continuous physical presence" required for suspension of deportation. The applicant had not applied for suspension of deportation at the time of taking advance parole; nor could he have applied since such relief is available only in deportation proceedings and the Service had not sought deportation. Initially admitted as a nonimmigrant student, the applicant was a resident of the United States who was subject to deportation rather than exclusion proceedings. Before departing under a grant of advance parole, the applicant had applied for asylum with the Service and could have applied for suspension of deportation at any time he was placed in deportation proceedings.

The applicant applied for advance parole in January 1993 in order to visit his father who was sick with cancer. The information provided to the applicant on the advance parole form was the following:

> If, *upon your return* to the United States you are found to be inadmissible, you will be subject to exclusion proceedings under section 236 of the Immigration and Nationality Act.

(Emphasis added.) The message conveyed by this notice is ambiguous. One could reasonably assume from the language used that the notice focused upon what could occur at the point of return to the United States.

A natural reading of the reference to a finding of inadmissibility "upon your return" is that a decision to initiate exclusion proceedings may be made *at the time of return* to the United States. If at that point there is evidence of criminal conduct, for example, or some other reason for exclusion unrelated to lack of documentation, the Service may immediately institute exclusion proceedings. *See Navarro-Aispura v. INS, supra*, at 236. In *Navarro-Aispura*, however, and in this case, the applicants were admitted as parolees upon return and permitted to resume residence in the United States for many months before any further action was taken on their pending applications for relief from deportation.

Although the applicant could reasonably have understood from the information on the advance parole form that he risked being placed in exclusion proceedings at the time of his return to the United States, he was not informed that, even if admitted upon return as an advance parolee, he would forever after be subject to exclusion proceedings with the consequence of forfeiture of all the procedural and substantive rights available only in deportation proceedings.

In some respects the notice to the applicant in this case is more flawed than that provided in *Navarro-Aispura*. Although the notice to Navarro-Aispura referred only to adjustment of status, an application for registry under section 249 of the Act, 8 U.S.C. § 1259 (1994), is submitted on the same Form I-485 used for adjustment of status under section 245 of the Act, 8 U.S.C. § 1255 (1994), *See* 8 C.F.R. § 249.2 (1997). Thus Navarro-Aispura may have reasonably understood that his application for registry could be considered a type of application for adjustment of status which could be affected by taking advance parole. Furthermore, the notice in *Navarro-Aispura* indicated that the applicant would be placed in exclusion proceedings should his pending application for adjustment of status be denied after return. In the instant case, the ambiguity in the notice is such that a reasonable applicant would not expect that the right to a deportation proceeding would be precluded after readmission to residence in the United States pursuant to a grant of

advance parole.[1]

The Ninth Circuit's decision in *Barney v. Rogers*, 83 F.2d 318 (9th 1996), provides an illustration of language used in an advance parole form which more clearly spelled out the consequences of departure. In *Barney,* the applicant had applied for adjustment of status prior to departing under a grant of advance parole. The notice on her advance parole form advised:

> If your application for Adjustment of Status is denied, you will be subject to exclusion proceedings under Section 236 of the Immigration and Nationality Act. Individual to be paroled into the United States for an indefinite period of time providing prima facie eligibility for adjustment of status continues.

*Id.* at 320. This warning informed the applicant in *Barney* that she would be subject to exclusion proceedings should her application for adjustment of status be denied at any time after her return. Comparable notice in regard to the applicant's situation after his return to residence in the United States was not afforded in the instant case. Fundamental fairness requires clearer language than that provided to the applicant in this case before he can be said to have forfeited his status as a resident alien entitled to a deportation hearing.

At the time he departed pursuant to advance parole, the applicant in this case was prima facie eligible for suspension of deportation under section 244(a) of the Act. Notably, the statute governing suspension of deportation specifically provides that a "brief, casual, and innocent" departure from the United States shall not disrupt "continuous physical presence." Section 244(b)(2) of the Act. The Ninth Circuit has held that an alien who took an 8-day trip to Mexico to attempt to obtain a visa, and then attempted to enter the United States illegally, did not interrupt his continuous physical presence for suspension of deportation purposes. *Castrejon-Garcia v. INS,* 60 F.3d 1359 (9th Cir. 1995). Referring to the "brief, casual and innocent" test of section 244(b)(2), the Ninth Circuit noted that "[t]he evident statutory purpose is to recognize that a person who lives for seven continuous years in the United States does not destroy his eligibility by actions that do not affect his commitment to living in this country." *Id.* at 1362. Indeed, had

---

[1] In his pro se brief filed with the Board, the applicant explained: "I applied for a parole. Trusting it to be a simple permission for a brief visit, it turns out to be a disaster. True, the parole clearly states: '*If upon your return to the UNITED STATES you are found to be inadmissible*, you will be subject to exclusion proceedings . . .'. Apparently in my case there is no condition/effect statement. Had I known that I was inadmissible, I would have never left." As the applicant explains, he understood the wording of the condition in the warning, "upon your return . . . found to be inadmissible," not to include the situation of a returnee who is inspected and permitted to resume residence in the United States.

the applicant accomplished his brief departure from the United States without authorization by the Service and then reentered without inspection, he would have remained subject to deportation proceedings as an illegal entrant and could have remained eligible for suspension of deportation under section 244(b). *See, e.g., de Gallardo v. INS*, 624 F.2d 85 (9th Cir. 1980) (stating that illegal entry or reentry does not necessarily render absence not "innocent" under section 244(b)); *Castrejon-Garcia v. INS*, *supra*. It defies logic, if not due process and equal protection, to conclude that the applicant forfeited his right to a deportation hearing and his right to apply for suspension of deportation when, instead, he followed the administrative procedure established by the Service for obtaining advance parole to depart and reenter.

It is interesting to note that the right to apply for suspension of deportation can be forfeited in a number of situations, e.g., for failure to appear for a deportation hearing or to comply with a grant of voluntary departure. *See* section 242B(e) of the Act, 8 U.S.C. § 1252b(e) (1994). The statute, however, limits forfeiture to instances in which oral notice of that consequence of failure to appear has been communicated to the alien. *See* sections 242B(e)(1), (5) of the Act. This statutory requirement of notice before forfeiture of procedural and substantive rights otherwise available to an alien who has entered and resides in the United States is fundamental to fair play and elemental justice. The holding in *Navarro-Aispura* similarly preserves fundamental fairness in assuring adequate notice before an alien who accepts advance parole status is categorically relegated to exclusion proceedings. The holding in *Navarro-Aispura* should guide our determination in this case regarding whether the applicant was afforded adequate notice that he would be forfeiting his right to a deportation hearing. The notice afforded in this case does not meet the basic requirements of justice and fundamental fairness. For that reason I would reverse the decision of the Immigration Judge and terminate exclusion proceedings in this case.